IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Steven Schwartz, pro se                    Civil Action No.
Reg. No. 37542-066                            17-CV-03799-NIQA
FPC Schuylkill - Camp 2
P.O. Box 670
Minersville, PA 17954

---

STEVEN SCHWARTZ                         :
Reg. No. 37542-066
FPC Schuylkill - Camp 2                 :
P.O. Box 670
Minersville, PA 17954                   :
                     Plaintiff,

                                        :
        v.
                                        :
APRIL TAYLOR
2305 Abercorn Street                    :
Savannah, GA 31401
                     Defendant,         :

ROCCO CIPPARONE, JR.                    :
203-205 Black Horse Pike
Haddon Heights, NJ 08030                :
                     Defendant,
                                        :
LINDA LANE
208 Juniper Drive                       :
Cherry Hill, NJ 08003
                     Defendant,         :

JON LUDLAM                              :
1206 Winston Way
Cherry Hill, NJ 08034                   :
                     Defendant,
                                        :
JEFFREY ZUCKER, ESQ.
519 Federal Street, Suite 503           :
Parkade Building
Camden, NJ 08103                        :
                     Defendant

---

**FILED**

AUG 27 2018

KATE BARKMAN, Clerk
By_____Dep. Clerk

### Civil Action-Complaint

Steven Schwartz, pro se, files the within complaint against Defendants April Taylor, Rocco Cipparone, Jr., Linda Lane, Jon Ludlam and Jeffrey Zucker and in support thereof avers the following:

### The Parties

1.  Plaintiff Steven Schwartz is an adult individual that currently is incarcerated and held at FPC Schuylkill, P.O. Box 670 Camp 2, Minersville, PA 17954.

2.  Defendant April R. Taylor is an adult individual who upon information and belief currently resides at 2305 Abercorn Street Savannah, GA 31401.

3.  Defendant Rocco Cipparone, Jr., is an adult individual who maintains his offices at 203-205 Black Horse Pike, Haddon Heights, New Jersey 08035.

4.  Defendant Linda Lane is an adult individual who upon information and belief resides at 208 Juniper Drive, Cherry Hill, New Jersey 08003.  Defendant Lane is an Aunt by marriage of Plaintiff.

5.  Defendant Jon Ludlam is an adult individual who upon information and belief resided at 1206 Winston Way, Cherry Hill, New Jersey 08034.

6.  Defendant Jeffrey Zucker is an adult individual who upon information and belief maintained his offices at 519 Federal Street Parkade Building Suite 503, Camden, New Jersey 08103.

-1-

### Statement of Relevant Facts

7.   Defendant Lane conducted businesses and investments over the years with Peggy Sue Dorsey (Plaintiff's ex-fiancée) from her home at 208 Juniper Drive, Cherry Hill, New Jersey 08003.

8.   Plaintiff provided expertise and secured capital for the operation of these businesses.  Defendant Lane left debt to Ms. Dorsey which Plaintiff satisfied.

9.   Defendant Lane maintained records for a commodity account held with Lind Waldock which Ms. Dorsey was a joint account holder. Plaintiff controlled and secured funding for said account.   The records were stored at 208 Juniper Drive, Cherry Hill, New Jersey 08003.

10.   Defendant Lane attended multiple court proceedings in which Plaintiff was a party including at least one proceeding in the federal courthouse located in Camden, New Jersey.

11.   Defendant Lane met Brian Shaughnessy at the aforementioned proceeding.  Mr. Shaughnessy was an attorney who maintained offices in both New Jersey and the District of Columbia.

12.   Defendant Lane was fully familiar with Plaintiff's history and characteristics.  See Exhibit A.

13.   Mr. Shaughnessy introduced Plaintiff to another one of his clients, who he was representing in New Jersey by the name of Jon Ludlam.  Defendant Ludlam in turn introduced Plaintiff to two Pennsauken New Jersey business men by the name of Sam and George

-2-

Handel.

14.  Defendants  Ludlam and Shaughnessy solicited Plaintiff to work with them in operating an investment business.  According to Defendant Ludlam, Shaughnessy was lead counsel for the U.S. Airway Pilot Union and that he and Shaughnessy had the ability to secure a large number of retired U.S. Airway Pilots' retirement accounts.

15.  Based on Defendant Ludlam and Shaughnessy's representations, Plaintiff agreed to operate investment companies with Shaughnessy providing legal counsel and regulatory filings for the investment companies and Ludlam and Shaughnessy providing the investors.

16.  In the calendar year 1998, meetings were held at the offices of Handel & Company, Inc. 5900 Westfield Avenue, Pennsauken, New Jersey 08110 on approximately a bi-weekly basis where all aspects of the proposed investment companies were discussed.  These meetings were attended by defendant Ludlam, Plaintiff and Sam Handel.

17.  Shaughnessy travelled to the Handel offices in Pennsauken, N.J. to provide legal counsel as to the formulation of the investment companies, and held at least one meeting with Plaintiff and Defendant Ludlam at his New Jersey address law office.

18.  Relevant paperwork was stored at the Pennsauken, New Jersey offices.

19.  At the conclusion of the afternoon meetings, Plaintiff and Sam Handel would travel to the home of Jon Ludlam at 1206 Winston

Way, Cherry Hill, New Jersey 08034 where the business meetings were continued and advertising literature created and stored.

20.   At Attorney Shaughnessy's direction, the companies operated whereby the investors would place their funds with 21st LTD and said funds were to be transferred to Yorkshire that was to serve as the brokerage arm.

21.   None of the aformentioned companies were shell companies and all served a legitimate purpose.   Unfortunately, after setting up the structure and operation of the investment companies, and after representing he was in the active process of obtaining the necessary regulatory approval, Shaughnessy failed to obtain the necessary registrations he was representing he was filing.

22.   Between 1997-2000 Defendant April Taylor resided with Plaintiff and his mother Ilene Schwartz for a substantial period of time at 13 Melissa Way, Plymonth Meeting, PA 19462.

23.   Plaintiff operated a number of investment companies  that invested in the stock, option and commodity markets.   Three of those being 21st LTD, Yorkshire and BAMM.

24.   During the relevant time periods, Defendant Taylor provided administrative support for 21st LTD, Yorkshire and BAMM.

25.   Defendant Taylor knew the aformentioned companies were not shell companies and each served a legitimate purpose and were formulated under Attorney Shaughnessy's direction.

-4-

26.    Defendant Taylor's brother served as a law clerk for Attorney Shaughnessy during the relevant time periods and personally witnessed Attorney Shaughnessy provide Plaintiff legal advice regarding these matters that Plaintiff relied upon.    See Exhibit B.

27.    During the same relevant time periods, Defendant Linda Lane obtained her brokerage license and incessantly requested Plaintiff open accounts with her at Legg Mason.

28.    In response to these solicitations, it was agreed among a number of other promises by Defendant Lane; a) Defendant Lane would not make any trading or management decisions nor interfere with Plaintiff's decisions on behalf of his clients; b) would ensure that Plaintiff had full authority over the accounts and confirmation of same from customers; c) would provide the accounts deep commission discounts (due to heavy trading activity); d) would maintain accurate trading and account records and provide same to clients.

29.    In response to these solicitations, Plaintiff set-up a meeting with Defendant Lane and the Handels at 5900 Westfield Avenue, Pennsauken, New Jersey 08110 and the following accounts were secured with Plaintiff having full authority of said accounts; HANTEX 405-11377; HANDEL & CO. 405-11378; SAMUEL HANDEL 405-11379; SAMUEL & GEORGE HANDEL 405-11380; GEORGE HANDEL IRA 405-74132; SAMUEL HANDEL IRA 405-741133; HANDEL & CO PENSION 405-11376; HANDEL & CO PROFIT SHARING 405-11375.

30.   In addition to the aforementioned eight accounts, Plaintiff secured an additional two New Jersey accounts for Defendant Lane in the names individually of Defendant Jon Ludlam and his wife Maria Ludlam.   Plaintiff also secured Defendant Lane an account for Oden Chavous ( Defendant Taylor's step-father) and Lester Kuhlman, retired U.S. Airway Pilot, Defendant Ludlam's close friend and Shaughnessy client.

31.   In October/November 1998, Plaintiff and his mother Ilene Schwartz received an award in the amount of $529.300 to compensate them for fraud committed against them by CoreStates Brokerage.   A portion of this award was deposited in the aforementioned accounts at Legg Mason  and entrusted with Defendant Lane. See Exhibit C.

32.   Between September 1998 - December 1998 Plaintiff created substantial profits in said accounts and provided Lane with more than $90,000 in commissions.   However, Defendant Lane thru a complicated fraud scheme, charged the accounts exorbitant commissions and in one instance charged more than $3000.00 for a single trade causing Plaintiff's clients to complain.

33.   Plaintiff repeatedly cautioned Lane regarding problems she was creating by overcharging the accounts.   However, Plaintiff could not contain Defendant Lane's systematic overcharging scheme.

34.   In addition, Defendant Lane failed to execute critical orders causing the account losses and millions of dollars of lost profit potential.[1]

---

1 The accounts were extremely profitable based on Plaintiff's trades.  Defendant Lane's unauthorized handling of the accounts created lost profit potential and losses that otherwise would not have occurred.

35.   Plaintiff had also executed an account held in the name of Peggy Sue Dorsey which Plaintiff funded (with Dorsey's permission).

36.   As it became clear to Defendant Lane  that she would not be able to secure the 21st LTD and Yorkshire accounts, Lane contacted the clients directly and attempted to steal Plaintiff's clients for herself and Legg Mason.

37.   On or about December 31. 1998, Defendant Lane contacted the account holders  and attempted to steal the accounts away from Plaintiff and upon information and belief providing them with false and defamatory information regarding the Plaintiff.

38.   Plaintiff contacted Attorney Shaughnessy who was then serving as 21st LTD's general counsel. Shaughnessy contacted Legg Mason, Lester Kuhlman, Jon Ludlam and George and Sam Handel who all advised Shaughnessy they wished to leave Legg Mason and have the funds in all the accounts they held at Legg Mason transferred to 21st LTD.  (Defendant Taylor was contacted on behalf of Oden Chavous.)

39.   It was agreed that all contacts with Legg Mason going forward regarding the aforementioned accounts would be handled by Brian W. Shaughnessy and/or a representative of the firm Shaughnessy, Volzer & Gagner.

40.   Kurt Lalomia, a Legg Mason compliance manager, requested Shaughnessy provide an authorization from each account holder providing Attorney Shaughnessy full authorization to conduct

transactions on the account holders' behalf.

41.    Attorney Shaughnessy dictated and arranged for execution of all authorization forms for the client to sign authorizing him to direct transfers of funds to 21st LTD.

42.    Attorney Shaughnessy contacted Defendant Ludlam in New Jersey and directed Defendant Ludlam to obtain all signatures.

43.    Defendant Taylor either obtained Mr. Chavous' signature, or signed Chavous' name with Mr. Chavous' full authorization.

44.    Defendant Taylor maintained a copy for herself and provided the original authorization to Attorney Shaughnessy.

45.    After receiving approval from Mr. Kuhlman, Mr. Ludlam, Mrs. Ludlam and Sam and George Handel, Attorney Shaughnessy directed Defendant Ludlam to provide the individuals with the authorizations and to return to Jon Ludlam original signatures, where the authorizations were copied and stored at 1206 Winston Way, Cherry Hill, NJ 08034.

46.    From his New Jersey residence, Ludlam spoke with Lester Kuhlman, George Handel, Samuel Handel and his wife who all provided Ludlam with verbal authorization that Shaughnessy was going to direct all withdrawals from Legg Mason to 21st LTD and handle all transactions.  Copies of the written authorization were all executed and retained and stored at Ludlam's New Jersey residence.

47.    Originally, Lester Kuhlman deposited his retirement funds

with 21st LTD. Said discussions regarding these transfers were discussed by telephone with Mr. Kuhlman at 1206 Winston Way, Cherry Hill, New Jersey 08034.

48.    Due to Attorney Shaughnessy's delay in obtaining approval for 21st LTD to accept IRA funds, Plaintiff opened the Kuhlman Legg Mason account to ensure Kuhlman was not subject to a tax penalty and Plaintiff sent the funds held at 21st LTD to the Legg Mason IRA account Plaintiff established on Mr. Kuhlman's behalf.

49.    Kuhlman then agreed for his funds to be transferred <u>back</u> to 21st LTD recognizing the tax penalty he would incur. (Kuhlman had a long history of draining his IRA and incurring early withdrawal penalties).

50.    Thus, Defendant Taylor, Defendant Ludlam, Mr. Kuhlman, Sam Handel, George Handel, Brian Shaughnessy and his firm all had copies of this authorization that Legg Mason demanded of Shaughnessy that would allow Shaughnessy to conduct transactions for the aforementioned and direct withdrawals from Legg Mason to 21st LTD.

51.    Plaintiff was never provided a copy of these authorizations.

52.    Attorney Shaughnessy directed scores of wire transfers from the Legg Mason accounts to 21st LTD based on said authorizations.

53.    As Attorney Shaughnessy advised, the funds were transferred from 21st LTD to Yorkshire.

54.    Defendant Taylor and Defendant Ludlam had full access to all account statements and were fully aware that neither 21st LTD

or Yorkshire were shell companies and transfer of funds from 21st LTD to Yorkshire were not conducted to hide investor funds.

55.  In the summer of 1998, Defendant Taylor reported that she provided Peggy Sue Dorsey with $100,000.00 of Plaintiff's funds.

56.  Plaintiff believed Defendant Taylor.

57.  In the fall of 1999, Ms. Dorsey embezzled and converted an additional $276,000.00 of investment funds that were to be deposited into 21st LTD.

58.  Despite repeated demands, Dorsey has not returned a majority of the $276,000.00 she embezzled and converted for her own personal use or any of the $100,000.00 that was loaned to Ms. Dorsey.

59.  Defendant Taylor and Dorsey remained in personal contact during the time period Dorsey was in the process of embezzling Plaintiff's and his mother's funds.

60.  According to Defendant Ludlam, Ludlam had personal contact with Ms. Dorsey regarding these embezzled funds.  Defendant Ludlam has not provided Plaintiff with information obtained by Defendant Ludlam or the motives of his continued conduct with Dorsey.

61.  In the fall of 1999, George Handel filed false charges of embezzlement against Plaintiff and others regarding the Legg Mason withdrawals, with the FBI.

62.  In doing so, George Handel concealed the existence of the authorizations he and his brother executed allowing the transactions that he and his brother approved by written authorization to be carried out.

63.   In February 2000, George Handel initiated litigation in Philadelphia Common Pleas Court alleging Plaintiff, his mother (Ilene Schwartz), Jennie Artzt and others of making unauthorized withdrawals from these Legg Mason account.  Again, George Handel concealed the existence of the authorizations he and his brother executed.

64.   The aforementioned lawsuit filed by George Handel in reality alleged that Plaintiff, his mother and Ms. Artzt actually embezzled their own funds for these were funds that Plaintiff, his mother and Ms. Artzt actually deposited in the accounts.

65.   The Handel lawsuit was assigned to the Honorable Nitza I. Quinones Alejandro.

66.   The Handel Attorney, C. George Milner, of the firm Cozen & O'Conner, met ex parte with Judge Quinones and presented ex parte information of his alleged standing within a federal grand jury to improperly influence Judge Quinones in Milner's attempt to improperly utilize the Judge to set Plaintiff up for obstruction charges.

67.   Milner failed to disclose to Judge Quinones his lawsuit was a sham for he was suing various individuals for embezzling their own funds and his client and his brother executed authorizations authorizing the very transactions that Milner represented were unauthorizied.

68.   Judge Quinones granted Milner the relief he requested in his ex parte presentation.

-11-

69.  Defendant Lane retained Ronald P. Schiller and the firm of Piper Marburry Rudnick & Wolfe who lodged a third party claim against Attorney Shaughnessy and cross-claimed Plaintiff and his mother.

70.  In order to evade  Judge Quinones' jurisdiction, Shaughnessy executed a "perjured" affidavit, lying about a number of matters and locking himself in to concealing the reality that he had conversations with the aforementioned account holders who approved of the withdrawals.  See Exhibit D.

71.  The perjured affidavit was presented to Judge Quinones.

72.  Defendant Lane's Attorney Ronald P. Schiller made false statements to Judge Quinones regarding Plaintiff, even resorting to presenting Judge Quinones with a false compendium of Plaintiff's history to improperly influence Judge Quinones regarding Plaintiff.

73.  Attorney Schiller, upon information and belief, was working at Defendant Lane's direction and Defendant Lane was aware of the false statements and false information being presented to Judge Quinones by Attorney Schiller.

74.  George Handel also named Defendant Ludlam in the lawsuit and then mysteriously failed to serve him.

75.  During all relevant time periods, Milner used his fabricated lawsuit to humiliate Plaintiff, defame Plaintiff in the community, obtain documents regarding Plaintiff's business he had no lawful rights to and scare Plaintiff's business partners and destroy business relationships.

-12-

76.  At no time did Juge Quinones take any actions to control Milner's illegal conduct, or Milner's sham lawsuit.

77.  Plaintiff contacted Ms. Dorsey to advise her of Milner's illegal discovery efforts and warned her she might be contacted and pulled into the sham lawsuit.

78.  In response to receiving information of the sham lawsuit, Dorsey threatened Plaintiff.

79.  With Plaintiff distracted by the sham lawsuit, and the problems it created, Défendant Taylor took advantage and began siphoning of Plaintiff's funds to boyfriends, girlfriends, and immediate family members without Plaintiff's assent and authorization.

80.  In April-July 2000, Plaintiff entrusted Defendant Taylor with $145,000.

81.  Defendant Taylor stole each and every dollar of said funds.

82.  In August 2000, Plaintiff entrusted Defendant Taylor with approximately $100,000.

83.  Defendant Taylor stole each and every dollar of said funds.

84.  In December 2000, Plaintiff entrusted Defendant Taylor with $1,500.00 from Ilene Schwartz's credit card. (Plaintiff's mother).

85.  Defendant Taylor stole each and every dollar of said funds.

86.  During all relevant time periods, Taylor was scared of Milner's false allegations and Judge Quinones' reactions to same.

-13-

87.  At some unknown point in time, the FBI came in contact with Plaintiff's legal assistant and assistant in Plaintiff's investment businesses, Jennifer Brennan.  Ms. Brennan was organizing discovery ordered by Judge Quinones and she began secretly working as a mole for the FBI.

88.  In the spring of 2001, a few days before the scheduled deposition of Plaintiff and his mother in the Judge Quinones matter, the FBI conducted a raid of the Schwartz home.

89.  The raid focused on taking pictures and videotaping the discovery that Judge Quinones  approved  regarding the sham lawsuit.

90.  The Handel lawsuit was re-assigned from the docket of the Honorable Nitza I. Quinones Alejandro to the Honorable Sandra Mazer-Moss.

91.  Judge Moss rejected Milner's statements and attempts to intimidate her with the federal authorities and <u>dismissed the sham lawsuit with prejudice in its  entirety</u> (finding Milner incredible).

92.  The phony lawsuit proceeding before Judge Quinones succeeded in its  purpose of having a detrimental and highly adverse effect on all aspects of Plaintiff's personal and business relationships.

93.  During Judge Quinones' tenure of these matters, the federal prosecutors subpoenaed Defendant Taylor to appear in Philadelphia and the Government provided Defendant Taylor with a New Jersey Attorney by the name of Rocco Cipparone, Jr. Esq.

-14-

94.   Despite the fact  Defendant Taylor had just absconded with $246,500.00 of Plaintiff's funds, Taylor never paid a dime of Defendant Cipparone's fee.

95.   Upon information and belief, defendant Cipparone's entire fee was paid by the Government which motivated Defendant Cipparone to counsel Taylor to lie to obtain legal fees he otherwise would not have obtained.

96.   During all relevant time periods, Defendant Cipparone was Defendant Taylor's attorney in name only and was working only to secure his own interests and providing the Government with false testimony to secure an unconstitutional conviction to enhance his own economic standing.

97.   Upon information and belief, Defendant Cipparone corruptly persuaded Defendant Taylor to lie to the federal prosecutors and to tell the federal prosecutors that she did not steal the $246,500.00 and only siphoned off a few thousand dollars to support a crack cocaine habit (a habit unknown to Plaintiff).

98.   Upon information and belief, Defendant Taylor was required to produce her copy of the authorization she retained that Mr. Chavous executed or she executed on Mr. Chavous' behalf.  Upon information and belief, Defendant Taylor provided a copy and/or Defendant Cipparone maintained proof of the existence of said authorization in his legal files stored at 203-205 Black Horse Pike, Haddon Heights, N.J. 08030.

99.  Upon information and belief, Defendant Taylor was required to produce all documents that evidence she stole $246,500.00 from Plaintiff.  Upon information and belief, Defendant Taylor provided copies and/or originals of these documents to Defendant Cipparone who maintained copies and/or remnants of evidence of these documents in his legal files stored at 203-205 Black Horse Pike, Haddon Heights, N.J. 08030.

100.  Upon information and belief, Defendant Cipparone has corruptly persuaded and has continued to corruptly persude Defendant Taylor to lie to federal authorities regarding Plaintiff to harm Plaintiff to enhance his own standing with the federal government.

101.  Upon information and belief these criminal acts conducted by Defendant Cipparone have been carried out from his law office at 203-205 Black Horse Pike, Haddon Heights, New Jersey 08030.

102.  At some point on or about 2014-2015, Defendant Taylor on tape recorded telephone line reported that she maintained records that would evidence her thefts.

103.  These documents and the existence of these documents were concealed from Plaintiff throughout indictment, conviction, sentencing, §2255 and 60(b) proceedings.

104.  Upon information and belief, Defendant Taylor's criminal acts in withholding said documents and their existence was orchestrated by Defendant Cipparone and proof of the existence of said documents and/or remnants of such were maintained at Cipparone's

law offfices at 203-205 Black Horse Pike, Haddon Heights, New Jersey 08030.

105.  At the time Defendant Cipparone corruptly persuaded Defendant Taylor to lie to the federal authorities he was not providing lawful representation to Defendant Taylor but enhancing his own economic standing with the federal government by seeking to obtain Plaintiff's indictment by soliciting perjured testimony.

106.  Upon information and belief, Defendant Cipparone failed to advise· Defendant Taylor that she was not permitted to lie to the federal prosecutors regarding Plaintiff.

107.  Upon information and belief, after Defendants Taylor and Cipparone supplied the federal prosecutors with false information regarding this and other matters, Defendant Cipparone working for himself and the Government, obtained an agreement that Defendant Taylor would not be prosecuted for any crimes except for lying.

108.  After Defendant Cipparone solicited and structured the knowingly false testimony  that Defendant Taylor did not commit the $246,500 theft, and had Defendant Taylor provide statements that falsely incriminated Plaintiff, Defendant Taylor was presented to the Grand Jury to provide the perjured testimony.

109.  In the pre-trial process, Defendant Cipparone represented to Plaintiff, by way of Plaintiff's counsel Mark Cedrone, that Defendant Taylor would be providing Plaintiff assistance in his defense by providing information to the defense to assist in the

-17-

defense process.

110.  At the time Defendant Cipparone made these representations to Plaintiff (thru Plaintiff's counsel), the Plaintiff and Defendant were not adversaries.

111.  When Defendant Cipparone made the aforementioned representations, he knew Plaintiff would rely on the accuracy of these representations in formulating his defense.

112.  Plaintiff relied on Defendant Cipparone's representations of Ms. Taylor's aid in formulating and preparing his defense.

113.  Defendant Taylor never provided any assistance at all and provided no information to Plaintiff for defense preparation and presentation - nor did Defendant Cipparone.

114.  In addition, Defendant Cipparone represented to Plaintiff, by way of Plaintiff's counsel Mark Cedrone, that Ms. Taylor would assist Plaintiff in litigation Plaintiff was prosecuting in Tarrant County, Texas titled Steven Schwartz v. Peggy Sue Dorsey, No. 348-194695-02 348th Judicial District of Tarrant County, TX.

115.  Defendant Taylor never provided any assistance at all and provided no information to Plaintiff for preparation and prosecution of the Dorsey lawsuit that is still pending.

116.  Plaintiff believes and therefore avers, Defendant Taylor or Defendant Cipparone may possess documents evidencing Ms. Taylor's disbursement of additional $100,000.00 of Plaintiff's funds to Ms. Dorsey that Ms. Dorsey still has not returned.

117.  Defendants Taylor and Cipparone have fraudulently concealed the existence of these documents from Plaintiff,and Defendant Cipparone negligently misrepresented actions that he represented to Plaintiff he and Defendant Taylor would engage in to make the documents and information available to Plaintiff.

118.  Plaintiff has now been convicted of causing a $96,000. wire transfer that was directed by 21st LTD Attorney Brian Shaughnessy from Lester Kuhlman's Legg Mason account back to 21st LTD.

119.  Plaintiff has been wrongfully convicted, sentenced to a 243 month of incarceration and ordered to pay restitution on money Defendant Taylor has stolen, retained and distributed to friends and family members,and Plaintiff has been unable to establish the additional theft of funds of Plaintiff that have been unlawfully converted,and conduct business affairs.

120.  Plaintiff is actually innocent of causing this wire transfer allegedly without Mr. Kuhlman's approval as Mr. Kuhlman personally approved of the transaction and executed the same author-ization as Mr. Chavous that Defendant Taylor and Defendant Cipparone have fraudulently concealed.

121.  Defendants Taylor and Cipparone  knowingly, intentionally and with actual malice, joined a conspiracy with the United States, Brian Shaughnessy, Jon Ludlam, Linda Lane, Lester Kuhlman, Judith Kuhlman, George Handel and others still unknown to keep all copies of the authorizations Ludlam distributed and had returned to his home in New Jersey,from the Plaintiff.

122.  Defendants Cipparone and Taylor continued the conpsiracy knowing Plaintiff is in jail for crimes he did not commit for

-19-

Lester Kuhlman authorized the transactions as all of the other Legg Mason account holders did.

123.   In May 2016, Defendant Taylor agreed to provide a truthful statement that Yorkshire was not a shell company or utilized by Plaintiff to conceal money as alleged.

124.   After agreeing to the language of the statement, Defendant Cipparone obstructed justice and changed the language of the statement Defendant Taylor represented and agreed was accurate to obstruct presentation of truthful evidence and directed Defendant Taylor to provide non-truthful or less than truthful testimony.

125.   The agreement between Plaintiff and Defendant Taylor was reached by telephone calls initiated by Plaintiff from the State of New Jersey.   Upon information and belief, the intentional acts of obstruction of justice by Defendant Cipparone were carried out by him from his offices located in the State of New Jersey.

126.   Defendant Cipparone is in possession of <u>Brady</u> material that would exonerate  Plaintiff, reverse his conviction and/or resulting in Plaintiff's immediate release from custody (<u>see</u> <u>Brady v. Maryland</u>, 373, U.S. 83 1963).

127.   In early 2017, Plaintiff made request of Cipparone for production of all <u>Brady</u> material in Defendant Cipparone's possession.

128.   Defendant Cipparone does not refute the fact that he possesses such <u>Brady</u> material.

129. At this point, Defendant Taylor can suffer no harm as she can no longer be charged with any crime including perjury.

130. Despite the fact  any risk of harm to Defendant Taylor has been lifted, Defendant Cipparone has refused to turn over the Brady material in his custody and control that would allow Plaintiff to avail himself of post-conviction relief.

131. During the relevant time periods, Plaintiff entrusted Defendant Taylor with hundreds of thousands of dollars in investment capital in an account held at Quick & Reilly.

132. As a result of broker error, $250,000 in losses and lost profit potential occurred that Defendant Taylor agreed to recoup.

133. Based on Defendant Cipparone's negligent misrepresentations said $250,000 was not recouped and other monies due and owing to Plaintiff and others.

134. Defendant Taylor is currently in possession or was in possession of documents during the relevant time periods that evidence Defendant Taylor stole $246,500.

135. Defendants Cipparone and Taylor and others have conspired to this very day to conceal and hide documents that would exonerate Plaintiff and impede his ability to collect funds due and owing.

136. On the same day the federal authorities contacted Defendant Taylor, members of the New Jersey FBI proceeded to Defendant Ludlam's home at 1206 Winston Way, Cherry Hill, New Jersey 08034.

-21-

137.  At the time, Defendant's son Winston resided at the residence as well, and Winston was operating a large drug operation from the 1206 Winston Way Cherry Hill residence.

138.  Defendant Ludlam publicized he provided Defendant Zucker tens of thousands of dollars which were passed  along to New Jersey law enforcement authorities on behalf of Winston to protect Winston from prosecution.

139.  At the time  members of the New Jersey FBI went to the 1206 Winston Way, Cherry Hill, New Jersey residence; a) Handel and Shaughnessy were actively concealing the authorizations approving the Legg Mason withdrawals; b) the Kuhlman authorization form was stored at said residence; c) the 1206 Winston Way New Jersey address stored hundreds of thousands of dollars in cash.

140.  Upon information and belief, the New Jersey FBI never entered the 1206 Winston Way address.  This was the same day the Pennsylvania FBI was conducting an extensive raid of the Schwartz home and video taping the discovery gathered in the Handel case that Plaintiff was ordered to propound in accordance with Judge Quinones' order; and,  Defendant Taylor was contacted at the residence of Oden Chavous on that very day where two copies of the Legg Mason authorizations resided - Defendant Taylor's copy and Mr. Chavous'.

141.  Within days of the New Jersey FBI contact, Winston Ludlam telephoned Plaintiff's mother and requested if Plaintiff and his

-22-

mother had any problems with Winston.  Plaintiff's mother replied no.

142.  Upon information and belief, the New Jersey FBI questioned Defendant Ludlam extensively regarding the matters subject to the Handel lawsuit.

143.  Just as the other participants in the conspiracy, Ludlam concealed the existence of the Kuhlman authorization he maintained at his New Jersey residence as well as his and his wife's.

144.  Both having a personal interest in the matter, Defendant Ludlam retained Defendant Zucker who was counsel for Defendant Ludlam's son.

145.  Upon information and belief, from his New Jersey law offices, Defendant Zucker directed, operated and executed a scheme to rig judicial proceedings and conceal the existence of the Kuhlman authorization  that was in Ludlam's possession and Zucker knew was evidence subject to production to New Jersey law enforcement in response to their appearance at the New Jersey residence.

146.  At the same time, Defendant Zucker's client Winston Ludlam was not indicted for the drug operation that Winston had operated from the same residence where the Kuhlman, Handel and Ludlam authorizations resided and were stored despite the fact other Defendants were aware of Winston's large scale drug operation (i.e. Taylor, Lane, and possibly Cipparone).

147.  Upon information and belief, Defendant Zucker received cash payments from Defendant Ludlam, the source of which may have been 21st LTD.  Defendant Zucker has not returned said funds to 21st LTD.

148,  Defendant Zucker, during all relevant time periods, was fully aware of the Brady doctrine and his ongoing obligation to provide the Kuhlman authorization to Plaintiff and not to engage in obstructing investigations  (as well as Jon Ludlam and Handels ).

149.  However, to this day Defendant Zucker has intentionally and knowingly and for profit, concealed the existence of the Kuhlman authorization from Plaintiff and Ludlam's knowledge York-`shire was not a shell entity.

150.  Defendant Zucker is a highly experienced criminal defense attorney and is fully aware that since defendant Ludlam cannot be prosecuted for any crime including lying to law enfrocement author-ities, Defendant Zucker is violating his ongoing obligations to Plaintiff to provide Plaintiff with full Brady disclosures in accordance with the very suggestions and mandates of the legal associations he is a member.

151.  Furthermore, Defendant Ludlam in an ongoing attempt to rig judicial proceedings and for other purposes still unknown, conspired with others to obtain Plaintiff's wrongful conviction and falsely publicized that Plaintiff forged Ludlam's name on hundreds of account documents to open brokerage accounts without Ludlam's permission.

152.  Plaintiff has never forged Defendant Ludlam's name to any account documents.

153.  Upon information and belief, Defendant Zucker has posses-sion of documents and information to refute Ludlam's fabrications

-24-

and has engaged in acts of fraudulent concealment to keep said documents from Plaintiff and the Court.

154.  Ms. Dorsey was persuaded to join the conspiracy and told investigators she never heard of Sam Handel.  This was a lie as Ms. Dorsey conducted business with Mr. Sam Handel.  See Exhibit E.

155.  Ms. Dorsey also was persuaded to join the conspiracy by entering into a secret agreement with the Government whereby Dorsey would fabricate that Plaintiff attempted to open two broker-age accounts in her name at Ameritrade and PNC Brokerage without her knowledge and authority.

156.  However, both the allegations were fabricated and Plaintiff was eventually acquitted of both counts.  (The PNC allegation involved a joint account with Defendant Taylor).

157.  During the time period, Dorsey joined the conspiracy to rig judicial proceedings and fabricated that Plaintiff attempted to open said accounts without Ms. Dorsey's knowledge and permission, pending was Plaintiff's fraud and embezzlement claim against Dorsey.  Titled Steven Schwartz v. Peggy Sue Dorsey, No. 348-194695-02, 348th Judicial District of Tarrant County, TX.

158.  The Government entered into a secret agreement with Dorsey that if she testified falsely regarding the Ameritrade and PNC account they would assist Ms. Dorsey in derailing the Tarrant County proceeding.

159.  The Government and Ms. Dorsey filed no less than five

motions for protective order falsely claiming that Plaintiff's discovery efforts were harassing and demanding a stay of proceedings (relying on the fabrication involving the Taylor PNC account).

160.  The Tarrant County Court denied all of the Government and Ms. Dorsey's requests, finding Plaintiff's discovery to be proper, ruling in Plaintiff's favor and scheduling the trial to begin in two weeks.

161.  On or about May 5, 2003, Judge Dalzell read a highly false and defamatory, above the fold front page article planted to influence judicial proceedings against Plaintiff that reported falsely on these matters including the sham lawsuit Judge Quinones presided over.

162.  U.S.D.J. Stewart Dalzell in response to reading the false and defamatory article contacted Plaintiff at his home scheduling hearing on an expedited basis that day.

163.  The Government possessing no jurisdiction to obtain relief, presented to Judge Dalzell the same motions and arguments that the Tarrant County State Court rejected, and demanded that Judge Dalzell enjoin a Texas State Court from exercising their lawful powers over Plaintiff's claim against Dorsey.

164.  After call of the initial witness, knowing he possessed no lawful authority to enjoin a Texas State Court proceeding, Judge Dalzell  forced Plaintiff (under pains of illegal arrest) to agree to stay the Texas State Court proceeding and made clear litigation

was not to proceed against any witness or events related or even touching matters related to the criminal case.

165.   Judge Dalzell's actions were unlawful, however, Plaintiff had no authority or ability to challenge Judge Dalzell, the Government and others working with Dorsey, and real threats of liberty deprivation by usurping the power of lawful state court proceedings. Plaintiff's counsel Mark E. Cedrone directed Plaintiff, Judge Dalzell's order (as unlawful as it is), extended to all witnesses in the criminal case and their agents.

166.   Defendants Taylor, Ludlam and Lane were witnesses and Defendants Cipparone and Zucker were their lawyers.

167.   The Tarrant County litigation remains in stay status now for fifteen (15) years.

168.   The Government reneged on an agreement to return to Plaintiff a computer hard drive that upon information and belief possessed evidence that among other matters would prove the location of the monies stolen from Plaintiff by Defendant Taylor that Defendant Taylor abandoned at Plaintiff's home and the Government seized.

169.   In order to deny Plaintiff the ability to collect his funds, the Government with the assistance of Defendants Taylor and Cipparone, filed a Motion For Protective Order before Judge Dalzell.

170.   Defendant Taylor and Cippaarone fabricated that Taylor only stole a few thousand dollars from Plaintiff when both knew Defendant Taylor stole more than $246,500 and have been fraudulently concealing proof of Defendant Taylor's theft to this day.

171.  On the computer hard drive was other business related materials needed by Plaintiff to collect additional monies.

172.  Defendants Taylor and Cipparone created a false record to commit a fraud on the court.  Judge Dalzell's behavior was so irregular that day, Plaintiff proceeded without counsel the rest of the proceedings (pre-trial, trial and sentencing).

173.  Upon information and belief the computer hard drive is in possession of Defendant Taylor.

174.  Plaintiff utilized the aforementioned computer for business purposes with Defendant Taylor's authority.  Despite the fact Plaintiff by court order was to be given access to business related information on the computer, Defendants Cipparone and Taylor have fraudulently concealed the documents on the hard drive, taken possession of Plaintiff's business and court records and have denied Plaintiff access to same, despite the fact Plaintiff holds ownership interest in his business and legal files stored on the computer

175.  As to the matters mentioned;

   a. The Government at the conclusion of their case conceded to dismissal of the claim that Plaintiff attempted to open an account at PNC Brokerage in the names of Defendant Taylor and Peggy Dorsey, when this sham charge, that was lodged against Plaintiff, was the very basis of the alleged need for the Dorsey protective order.[2]

   b. Plaintiff was found not guilty by jury of allegedly opening an Ameritrade account in Peggy Dorsey's name (was also basis for the sham protective order).

---

[2] This was count 25 of the indictment and Taylor, Dorsey and others (including possibly Cipparone) conspired to obtain this trumped up charge falsely lodged against Plaintiff.

c. Peggy Dorsey's <u>lawsuit against plaintiff was
   dismissed</u> in Plaintiff's favor.

d. Plaintiff's lawsuit against Peggy Dorsey remains
   in stay ststus to this very day.

e. Plaintiff was never <u>indicted</u> or charged on any
   matter in the proceeding before Judge Quinones.

f. Plaintiff was <u>never</u> indicted or charged related
   to any conduct at Legg Mason involving Jon Ludlam,
   Maria Ludlam, Oden Chavous or Peggy Sue Dorsey.

g. Plaintiff remains convicted and incarcerated for
   allegedly forging Mr. Kuhlman's name to a $96,000
   wire transfer allegedly without Mr. Kuhlman's
   authority - completely fabricated charge which the
   Defendants have conspired to maintain by ongoing
   acts of fraud that have continued to this very day.

176.  Defendants have continued to engage in acts of conspiracy,
fraud, breach of contract to harm Plaintiff's economic standing,
keep him incarcerated for crimes they know Plaintiff did not commit,
rig judicial proceedings, believing Plaintiff will be subject to
illegal punishment if he presses claims against the Defendants.

177. Now the impediment preventing the filing of the lawsuit has
been lifted by Judge Dalzell's rather mysterious leave from the
federal bench.

As And For A First Cause
Of Action For Theft By Deception
As Against Defendant Taylor

178.  Plaintiff repeats and reiterates each and every allegation
set forth in paragraphs 1-177 above with the same force and effect
as if more fully set forth at length herein.

179.  Defendant Taylor obtained $145,000, $100,000 and $1,500
and kept said funds for her own personal use without Plaintiff's
knowledge, permission and assent and absconded with said funds.

-29-

Defendant Taylor has not returned any of the $246,500, she stole from Plaintiff despite receiving demand.

WHEREFORE, Plaintiff demands judgment against Defendant Taylor in the amount of $246,500, plus interest continuing to accrue, reasonable award of attorneys' fees, exemplary damages and such other relief as the Court deems just and proper.

As And For A Second Cause<br>
Of Action For Breach Of Contract<br>
Against Defendant Taylor

180.  Plaintiff repeats and reiterates each and every allegation set forth in paragraphs 1-179 above with the same force and effect as if more fully set forth at length herein.

181.  Defendant Taylor obtained $145,000, $100,000, and $1,500 from Plaintiff agreeing to use said funds for Plaintiff's benefit and as Plaintiff directed.

182.  In direct violation of the agreement, Defendant Taylor kept the entire $246,500 for her own personal use.

183.  Despite receiving demand from Plaintiff, Defendant Taylor has not returned any of the aforementioned funds.

WHEREFORE, Plaintiff Steven Schwartz demands judgment against Defendant Taylor in the amount of $246,500.00 plus interest continuing to accrue, reasonable attorneys' fees, exemplary damages and such other relief as the Court deems just and appropriate.

As And For A Third Cause<br>
Of Action For Fraud As Against<br>
Defendant Taylor

184.   Plaintiff repeats and reiterates each and every allegation set forth in paragraphs 1-183 above with the same force and effect as if more fully set forth at length herein.

185.   Defendant Taylor falsely stated that she would use funds she received from Plaintiff in the amount of $145,000, $100,000 and $1,500, solely for Plaintiff's benefit and solely at Plaintiff's direction.

186.   Based on Defendant Taylor's false statements, Plaintiff entrusted Defendant Taylor with $246,500.  Defendant Taylor absconded with $246,500 of the funds Plaintiff entrusted Defendant Taylor with.

187.   Despite receiving a demand and request for an accounting from Plaintiff, Defendant Taylor has not returned any of the $246,500 she absconded with.

WHEREFORE, Plaintiff demands judgment against Defendant Taylor in the amount of $246,500 plus interest  continuing to accrue, reasonable attorneys' fees, exemplary damages and such other relief as the Court deems just and proper.

### As And For A Fourth Cause Of Action For Breach Of Fiduciary Duty As Against Defendant Taylor

188.   Plaintiff repeats and reiterates each and every allegation set forth in paragraphs 1-187 above with the same force and effect as if more fully set forth at length herein.

189.   Defendant Taylor had a heightened relationship of trust and confidence with Plaintiff, thus constituting a fiduciary

-31-

relationship.

190. As part of the fiduciary relationship, Defendant Taylor agreed to furnish her best judgment.

191. Instead, Defendant Taylor absconded with $246,500.

192. In addition, Defendant Taylor did not honor her fiduciary obligation regarding the $250,000, entrusted with her and lost at Quick & Reilly.

193. By reason of Defendant Taylor's breach of her fiduciary duty with respect to the foregoing, Plaintiff has been damaged.

WHEREFORE, Plaintiff demands judgment against Defendant Taylor in the amount of $496,500 plus interest continuing to accure, reasonable attorneys' fees, exemplary damages and such other relief as the Court deems just and proper.

### As And For A Fifth
### Cause Of Action For Negligent Misrepresentation
### Against Defendant Cipparone

194. Plaintiff repeats and reiterates each and every allegation set forth in paragraphs 1-193 with the same force and effect as if more fully set forth at length herein.

195. Defendant Cipparone represented to Plaintiff by way of Plaintiff's attorney Mark Cedrone, that Defendant Taylor would provide Plaintiff information and assistance in the formulation of his defense in United States v. Schwartz, Cr. No. 03-35 EDPa.

196. At the time that Defendant Cipparone made the aforementioned representations to Plaintiff, thru Plaintiff's counsel, Plaintiff and Defendant Taylor were not adversarial.

-32-

197.   Defendant Cipparone represented to Plaintiff by way of
Plaintiff's attorney Mark Cedrone that Defendant Taylor would
provide plaintiff information and assistance in his collection
matters against Peggy Sue Dorsey.

198.   Defendant Cipparone knew Plaintiff would rely on Defendant
Cipparone's representations as to the formulation of his defense
strategy and business and collection matters.

199.   Defendant Cipparone and Taylor never provided Plaintiff
with any information or assistance in the formulation of his
defense strategy and business and collection matters as Defendants
represented to Plaintiff Defendant Taylor would do.

200.   Defendant Cipparone had a responsibility to act with care
when making the representations he knew Plaintiff would rely upon.

201.   Defendant Cipparone received a written request for infor-
mation available to Defendant Taylor regarding Plaintiff's
collection matters involving Ms. Dorsey, and Defendants Taylor and
Cipparone have not provided information and evidence available to
them to the Plaintiff.

202.   Defendants Cipparone and Taylor have refused to provide
the information available to them regarding the $100,000'of
Plaintiff's funds that Defendant Taylor gave to Ms. Dorsey that
Ms. Dorsey still has not returned to Plaintiff.

203.   As a direct and proximate result of Defendant Cipparone's
aforementioned negligent misrepresentations, Plaintiff has been

-33-

wrongfully convicted of crimes he did not commit, serving a 243 month term of imprisonment he otherwise would not have served, has not been able to collect funds Ms. Dorsey absconded with and related damages thereto.

WHEREFORE, Plaintiff demands judgment against Defendant Cipparone in the amount of one million dollars for each year Plaintiff remains incarcerated, 4.3 million dollars for funds due and owing from Ms. Dorsey, exemplary damages, plus interest and reasonable attorneys' fees.

### As And For A Sixth Cause
### Of Action Fraud Against Defendant
### Cipparone

204.  Plaintiff repeats and reiterates each and every allegation set forth in paragraphs 1-203 above with the same force and effect as if more fully set forth at length herein.

205.  During all relevant time periods, Defendant Cipparone was not actually functioning as Defendant Taylor's attorney but as an agent for the Government and serving his own economic benefit.

206.  In return for committing crimes against Plaintiff, such as subornation of perjury and acts of fraudulent concealment, Defendant Cipparone has secured Plaintiff's wrongful conviction and sentence and has obstructed related civil proceedings.  As a result, his standing within the U.S. Attorney's Office has been enhanced and he has received economic benefit.

207.  As Defendant Taylor can no longer be indicted for any

crime, including perjury, Defendant Cipparone has an affirmative obligation to provide Plaintiff with all Brady material in his custody and control that would exonerate Plaintiff.

208.    Defendant Cipparone has received from Plaintiff a written request to provide said Brady material.

209.    Defendant Cipparone did not refute that he possessed such materials, however, he still has not satisfied the Plaintiff's lawful demand.

210.    Furthermore, in continuing his fraud scheme, in calendar year 2016, after Defendant Taylor agreed to provide a statement that she represented was accurate that supported Plaintiff, Defendant Cipparone demanded that Defendant Taylor not provide the statement that Defendant Taylor represented was accurate and obstructed justice by altering the truthful statement into an untruthful and/or less than truthful statement.

211.    This willful act of obstruction of justice evidences the fraud scheme perpetrated upon Plaintiff who relied on Defendant Cipparone's claims that Plaintiff could rely on Cipparone's representations in conducting his legal defenses and collection and business affairs.

WHEREFORE, Plaintiff demands judgment against Defendant Cipparone in the amount of one million dollars for each year Plaintiff remains incarcerated, 4.3 million dollars due and owing from Ms. Dorsey, exemplary damages, plus interest and reasonable attorneys' fees.

### As And For A Seventh Cause
### Of Action For Fraudulent Concealment
### Against Defendants Taylor, Cipparone, Ludlam,
### Zucker And Lane (Spoliation)

212.  Plaintiff repeats and reiterates each and every allegation set forth in pargraphs 1-211 above with the same force and effect as if more fully set forth at length herein.

213.  Defendants Cipparone, Ludlam, Zucker and Lane all conducted busuiness from their offices and/or residence in the state of New Jersey and created, received, stored, documents in the state of New Jersey related to Plaintiff's business and/ or court related activities.

214.  Upon information and belief, all Defendants have destroyed or have continued to fraudulently conceal documents to rig judicial proceedings, to prevent Plaintiff from conducting and finalizing his business affairs and to collect money due and owing to Plaintiff.

215.  Upon information and belief, it is therefore averred, Defendants Cipparone and Taylor had possession and knowingly and with actual malice to harm Plaintiff; a) destroyed and/or frau-dulently concealed documents that evidence and/or remnants of documents that evidence that Defendant Taylor stole more than $246,500. of Plaintiff's funds; b) destroyed and/or fraudulently concealed the authorization that was executed by Defendant Taylor or Mr. Chavous that is substantially similar to the authorization executed by Lester Kuhlman; c) destroyed and/or fraudulently concealed documents proving the disbursement of $100,000. Plaintiff

entrusted to Defendant Taylor and loaned to Peggy Sue Dorsey; d) other business and financial records needed by Plaintiff for collection matters and court proceedings that remain concealed.

216.    Upon information and belief, it is therefore averred, Defendants Zucker and Ludlam had possession and knowingly and with actual malice to harm Plaintiff; a) destroyed and/or fraudulently concealed documents that evidence Lester Kuhlman approved of the $96,000. wire transfer from Legg Mason to 21st LTD; b) copies of the Jon Ludlam, Maria Ludlam, George Handel, Samuel Handel and Lester Kuhlman authorizations approving the removal of money from the Legg Mason accounts signed  by each account holder; c) documents that evidence that all account documents evidencing accounts held by Jon Ludlam were executed personally by Jon Ludlam and none were forged by Plaintiff; d) documents evidencing accounting of investments provided by Plaintiff; e) documents evidencing the secret siphoning of monies from Plaintiff and/or investment funds he was responsible for without Plaintiff's knowledge or permission; f) documents evidencing that Plaintiff's criminal proceedings were rigged by prosecutable perjury presented by Ludlam and others; g) other business and financial records needed by Plaintiff for collection matters and court proceedings that remain concealed; h) documents that evidence a secret agreement to protect Winston from prosecution in exchange for Defendant Ludlam's perjured testimony to wrongfully convict Plaintiff; i) documents that evidence the existence of a conspiracy

-37-

to rig judicial proceedings.

217.    Upon information and belief, it is therefore averred, Defendant Lane had possession and knowingly and with actual malice to harm plaintiff; a) destroyed and/or fraudulently concealed evidence that Lester Kuhlman approved of the $96,000 withdrawal from Legg Mason to 21st LTD; b) destroyed and/or fraudulently concealed documents that evidence that Peggy Sue Dorsey had knowledge and provided consent for an account opening at Legg Mason; c) destroyed and/or fraudulently concealed evidence that Defendant Lane and/or others had intentionally provided false information to investigators to improperly influence the investigation; d) destroyed and/or fraudulently concealed evidence that Defendant Lane caused losses and lost profit potential in the Legg Mason accounts; e) destroyed and/or fraudulently concealed evidence that Linda lane was fully aware of Plaintiff's past history and Defendant Lane lied to FBI agents, federal prosecutors and her own lawyers about this subject matter; f) destroyed and/or fraudulently concealed evidence of conspiracy Defendant Lane participated in to get Plaintiff convicted for crimes Defendant lane knew Plaintiff did not commit.

218.    Upon information and belief, it is therefore averred, Defendants Taylor, Cipparone, Ludlam, Zucker and Lane continue to fraudulently conceal documents they have yet to destroy that will exonerate Plaintiff.

219.    During all relevant time periods, Defendant Taylor,

-38-

Cipparone, Ludlam, Zucker and Lane had an affirmative obligation to maintain said documents and to provide and make said documents available to Plaintiff.

220.   However, with actual malice and with reckless disregard for their lawful obligations, Defendants Taylor, Cipparone, Ludlam, Zucker and Lane destroyed and have continued to fraudulently conceal said documents to this very day.

221.   Upon information and belief, it is therefore averred Defendants have destroyed and/or fraudulently concealed documents removed from the Pennsauken New Jersey address that exonerated Plaintiff and removed to their own New Jersey offices and residences that has prevented Plaintiff from collecting monies due and owing.

WHEREFORE, Plaintiff demands judgment against Defendants Taylor, Cipparone, Ludlam, Zucker and Lane, jointly and severally in the amount of one million dollars for each year Plaintiff remains incarcerated, 4.3 million dollars due and owing from Ms. Dorsey, and conversions of Plaintiff's capital that are still unknown, exemplary damages, plus interest and reasonable attorneys' fees.

As And For An Eighth Cause Of Action
For Civil Conspiracy Against Defendants
Taylor, Cipparone, Ludlam, Zucker And Lane

222.   Plaintiff repeats and reiterates each and every allegation set forth in paragraphs 1-221 above with the same force and effect as if more fully set forth at length herein.

223.   Defendants Cipparone, Taylor, Ludlam, Zucker and Lane have

-39-

knowingly, intentionally and with actual malice participated in an ongoing conspiracy with themselves, Brian Shaughnessy, Alex Warren, Lester Kuhlman, Judth Kuhlman, George Handel and others still unknown to destroy documents and/or fraudulently conceal documents and to keep information.

224.  Defendants Cipparone, Taylor, Zucker and Lane, have intentionally, knowingly and recklessly participated in said conspiracy to obstruct justice, rig judicial proceedings, keep lawful monies away from Plaintiff that are due and owing, interfere with collection efforts, to keep Plaintiff in jail illegally and to deny Plaintiff his post-conviction rights.

225.  Said conspiracy is ongoing and continues to this very day.

226.  Defendants Cipparone, Taylor, Ludlam, Zucker and Lane, have a continuing obligation to withdraw from the conspiracy, however, continue to knowingly participate and aid and abet the furtherance of the scheme.

WHEREFORE, Plaintiff demands judgment against Defendants Taylor, Cipparone, Ludlam, Zucker and Lane, jointly and severally in the amount of one million dollars for each year Plaintiff remains incarcerated, 4.3 million dollars due and owing from Ms. Dorsey, and amount to be determined as to conversions of Plaintiff's capital that are still unknown, exemplary damages, plus interest and reasonable attorneys' fees.

**As And For A Ninth**
**Cause Of Action For Neglect To Prevent Conspiracy**
**Against Defendants Cipparone And Zucker**

227.   Plaintiff repeats and reiterates each and every allegation set forth in paragraphs 1-226 above with the same force and effect as if more fully set forth at length herein.

228.   Defendants Cipparone and Zucker are members of the Bar of the State of New Jersey and have an affirmative obligation to prevent the carrying out of the aforementioned conspirational acts.

229.   Defendants Cipparone and Zucker have neglected to do so.

WHEREFORE, Plaintiff demands judgment against Defendants Cipparone and Zucker jointly and severally in the amount of one million dollars for each year Plaintiff remains incarcerated, 4.3 million dollars due and owing from Ms. Dorsey and an amount to be determined as conversions of Plaintiff's capital that are still unknown, exemplary damages, plus interest and reasonable attorneys' fees.

Respectfully submitted,

Steven Schwartz, pro se
Reg. No. 37542-066
FPC Schuylkill
P.O. Box 670
Minersville, PA   17954

-41-

Exhibit A

8/8/90

Dear Steven,

Hope your visit
with Peggy cheered you.
She's a real doll. She called
us to say goodbye.

Things here are exciting
as usual. My kids are
getting into mischief all the
time - they're real Superstein's.

Uncle Larry & I are
working hard - some days are
crazy busy & some days are
dead. It's a screwy business.

The current events with
Kuwait are on everyone's lips.
I hope we don't end up in
a war - not that they don't

-2-

deserve it

We talk to your mom
everyday - we try & keep her
spirits up. She's much
better with company - even
though she thinks she doesn't
want it.

Jason is now collecting
baseball cards avidly. I'm
trying to get some auto-
graphed for him by mailing
them to the players asking.
I'll let you know if it
works. They really increase
in value if you have the
right players. Just think,
an original mickey mantle
could be worth thousands. I hope
the same happens to Jason's

-3-

Mike Schmidts & Pete Roses.
keep up your spirits &
i'm buying you a lottery
ticket the day you get
out! Things have to get
better

Be careful & remember
we love you

Aunt Linda



Exhibit B

## DECLARATION

I, Eric Madison, do hereby state as follows;

1. I am currently employed as a Task Lead with eGlobalTech. I work for the Washington Headquarters Services in the transportation office at the Pentagon in Arlington, Virginia.

2. Between approximately late August, 1997, through early September, 1998, I was employed as a full-time legal clerk with the law firm of Shaughnessy, Volzer and Gagner.  My primary responsibility was to serve as Mr. Shaughnessy's legal assistant.

3. In the course of my employment with Mr. Shaughnessy, I fielded Mr. Schwartz's telephone calls to the firm, participated in and/or overheard conversations between Mr. Shaughnessy and Mr. Schwartz, retrieved and sent telefaxes between Mr. Shaughnessy and Mr. Schwartz and reviewed documents and filings.

4. I observed Mr. Shaughnessy represent himself as an attorney qualified to provide advice on securities matters.

5. I personally observed Mr. Shaughnessy provide Mr. Schwartz with legal advice regarding the formation and operation of his investment companies.

6. I recall, on many occasions, that Mr. Shaughnessy would promise to complete various tasks for Mr. Schwartz related to the operation of investment companies and would continually fail to keep his promises. Part of my duties was to cover for Mr. Shaughnessy. Thus, I was quite familiar with Mr. Shaughnessy's practice of making promises to Mr. Schwartz, not keeping his promises and then apologizing to Mr. Schwartz and promising to complete the task.

7. I also personally observed that Mr. Schwartz enjoyed more than a typical attorney/client relationship with Mr. Shaughnessy. As a matter of practice, Mr. Shaughnessy provided Mr. Schwartz with carte blanche to act in his stead and sign Mr. Shaughnessy's name to legal pleadings that were being filed in Mr. Schwartz's cases and in their business endeavors.

8. I also observed that Mr. Shaughnessy did not limit his authority to Mr. Schwartz to sign his name in specific instances.

9. I have reviewed Mr. Shaughnessy's testimony in United States v. Steven Schwartz, Cr. No. 03-35 April 11, 2005 Tr. Pgs. 138-139 where Mr. Shaughnessy denies he ever provided Mr. Schwartz authority to write any letters to anyone representing that he was Mr. Shaughnessy.

-2-

10.  By the time I started working with Mr. Shaughnessy, the authority for Mr. Schwartz to write letters on Mr. Shaughnessy's behalf was already in place.

11.  I have reviewed Mr. Shaughnessy's testimony in United States v. Steven Schwartz, Cr. No. 03-35 April 11, 2005 Tr. Pgs. 152 where Mr. Shaughnessy claims that he did not know that Mr. Schwartz provided me with permission to sign his name.

12.  Mr. Shaughnessy is mistaken.  Mr. Schwartz provided me with this authority at the urging of Mr. Shaughnessy when time did not permit Mr. Shaughnessy to sign documents himself.

13.  I have reviewed Mr. Shaughnessy's testimony in United States v. Steven Schwartz, Cr. No. 03-35 April 11, 2005 Tr. Pgs. 165-166 where Mr. Shaughnessy testified that he did not recall a meeting in his office that took place on November 5, 1998 and November 6, 1998.  This lapse in memory is not surprising to me.  I personally observed that Mr. Shaughnessy had a drinking problem that adversely affected his memory and his overall daily functioning.  I would personally observe Mr. Shaughnessy forget events and promises that he made to Mr. Schwartz and his other clients.

14.   Furthermore, I observed in other matters that Mr.
Shaughnessy would involve himself in business dealings
with his clients.

15.   I have reviewed Mr. Shaughnessy's testimony and, as an
individual who worked in his office as his law clerk, I
observed the aforementioned events and many of the events
I witnessed on a daily basis were contrary to what Mr.
Shaughnessy testified to.

16.   I have no ill will towards Brian Shaughnessy.  I am
providing said statement voluntarily and have not
received any compensation or incentive.

17.   I am April Taylor's brother.  At no time has Steven
Schwartz communicated to me any negative remarks or
embarrassing information regarding my sister.

18.   If I would have been contacted by any attorney who
represented Mr. Schwartz between the calendar years of
2003-2005, I would have responded to all inquiries and
provided Mr. Schwartz's counsel with any and all
information available to me that he requested.

     I hereby certify that the foregoing is true and
correct in accordance with 28 U.S.C. §1746.

Dated:   _3/17/2014_          _Eric Madison_
                              Eric Madison

-4-

# DECLARATION

I, Eric Madison, do hereby state as follows:

1. I am currently employed as a Program Analyst with the
   U.S. Department of Transportation.  I work for the
   Federal Transit Administration located in Washington,
   D.C.

2. April Taylor, a witness for the government, is my sister
   and, to my knowledge, resided in the Schwartz residence
   from 1997 to 2000.

3. I was in continuous contact with April in the time period
   she resided in the Schwartz household.

4. At no time did my sister ever relate to me that she
   suffered any physical or emotional abuse due to either
   Steven or Ilene Schwartz, nor was she ever deprived
   financially.  To the contrary, I am aware of her feeling
   of equal status and enjoying very comfortable and
   pleasant living accommodations.  I am also aware that
   April called Ilene "Mom".

5. April had complete freedom to do as she pleased and was
   never confined to the Schwartz house.

6. Furthermore, no member of our family ever advised me that
   my sister was unhappy with her relationship with either
   Steven or Ilene.

7. Any suggestion that Steven or Ilene Schwartz mistreated
   or abused April in any way, to my knowledge, would be
   false.


   I hereby certify that the foregoing is true and
correct in accordance with 28 U.S.C. §1746.


Dated: _May 17/2017_          _Eric Madison_ (signature)
                              Eric Madison

Exhibit C

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEY ACCOUNT
ONE LOGAN SQUARE
PHILADELPHIA, PA  19103

1467

October 26      19 98      3-1/310

PAY
TO THE
ORDER OF  Ilene Schwartz & Steven Schwartz                    $ 541,143.30

EXACTLY 541,143.30 CTS
EB8266

_____DOLLAR

CoreStates
First Pennsylvania
Bank

Payment for NASD Arbitration Award in
FOR  Schwartz v CoreStates Securities Corp, et al        Lynne P. Pierce

⑈00146 7⑈  ⑆0310000 11⑆  0126⑈6142⑈    97

---

1512

MORGAN LEWIS & BOCKIUS LLP  03/91
ATTORNEY ACCOUNT
ONE LOGAN SQUARE, SUITE 2000
PHILA, PA  19103-6920

Sept.1, 1999      3-1/310
DATE

PAY
TO THE
ORDER OF   Steven & Ilene Schwartz                    $ 19,833.26

EXACTLY 19,833.26 CTS
EB8266

DOLLARS

CoreStates
Bank

FOR

⑈0015 12⑈  ⑆0310000 11⑆  0012⑈66142⑈

Lynne Pierce

# NASD REGULATION, INC. AWARD

## NASD REGULATION, INC. - OFFICE OF DISPUTE RESOLUTION

In the Matter of the Arbitration Between

<u>Name of Claimants</u>

Ilene and Steven Schwartz

92-01588

<u>Name of Respondents</u>

CoreStates Securities Corporation
Kevin Kelly

## REPRESENTATION

For Claimants Ilene and Steven Schwartz ("Claimants"): Steven Schwartz

For Respondents CoreStates Securities Corporation ("CoreStates") and Kevin J. Kelly ("Kelly"): Elizabeth Hoop Fay, Esq. and Gregory M. Harvey, Esq. of the law firm of Morgan, Lewis & Bockius, Philadelphia, PA

## CASE INFORMATION

Statement of Claim filed:  January 17, 1991.
Claimants' Submission Agreement signed on: January 28, 1992.

Joint Answer of Respondents CoreStates Securities Corporation and Kevin Kelly (collectively referred to as "Respondents") filed on: August 11, 1992.

Respondent CoreStates Submission Agreement executed by James B. Warden, President, CoreStates Securities Corporation on: August 6, 1992.

Respondent Kelly's Submission Agreement signed on: July 29, 1992.

## HEARING INFORMATION

Preliminary Hearing with the Full Panel: January 18, 1995 - one session

Schwartz Award
Case No. 92-01588
Page -2-

Hearing Dates/Sessions:

September 24, 1996 - two sessions
September 25, 1996 - two sessions
September 26, 1996 - two sessions


October 21, 1996 - two sessions
October 22, 1996 - two sessions
October 23, 1996 - one session
October 24, 1996 - two sessions
November 7, 1996 - two sessions
November 8, 1996 - two sessions
November 18, 1996 - one session
January 13, 1997 - two sessions
January 14, 1997 - two sessions
March 3, 1997 - two sessions
March 6, 1997 - two sessions
April 15, 1997 - two sessions
April 16, 1997 - two sessions
April 17, 1997 - two sessions
April 18, 1997 - two sessions
April 22, 1997 - two sessions
April 29, 1997 - two sessions
April 30, 1997 - two sessions
May 22, 1997 - one session
May 28, 1997 - two sessions
July 7, 1997 - two sessions
July 24, 1997 - two sessions
August 12, 1997 - two sessions
August 13, 1997 - two sessions
August 14, 1997 - two sessions
August 15, 1997 - two sessions
September 5, 1997 - two sessions
September 11, 1997 - two sessions
September 12, 1997 - two sessions
October 8, 1997 - two sessions
October 9, 1997 - two sessions
Total Number of hearing sessions with the full panel = 66


Hearing Location: NASD Regulation, Inc., District Office, Philadelphia, PA

## CASE SUMMARY

Claimants alleged, among other things, on January 26, 1985 they opened an account with Philadelphia

Schwartz Award
Case No. 92-01588
Page -3-

National Bank doing business as PNB Discount Brokerage Services "PNB". PNB is now known as
CoreStates Securities Corporation and will be referred to as "CoreStates". Claimant alleged that
Respondents solicited Claimants' business and promised Claimants that they would have virtually
instantaneous execution of trades. Claimants alleged that in November of 1985 they began trading
options with Respondents but that Respondents failed to timely sell Claimants' options, forcing Claimants
to execute on their 221 November 135 calls on IBM. Claimants alleged that based on this experience
Claimants virtually stopped trading options with Respondents. Claimants alleged that once again
Respondents actively solicited Claimants to trade options, claiming that Respondents would provide direct
access to the trading floor for all option trades. Claimants alleged that Respondents gave them a special
telephone line and were told that no other customers had access to this line. Claimants' alleged that based
on Respondents' representations that Claimants resumed trading options with Respondents. Claimants
alleged that between April 25, 1986 and November 28, 1986, Claimants account diminished, the majority
of the decline in Claimants' account was caused by Respondents' fraudulent and negligent trading
practices and delays in placing orders. Claimants alleged that in September of 1986, Respondents actively
solicited Claimants to trade index options, even though Kelly, the person primarily responsible for
Claimants' account was not licensed to trade index options. Claimants alleged that they did not receive
timely execution of their index option trades and that such delays caused Claimants to suffer losses.
Claimants alleged that they later learned that Respondents were not sending their trades directly to the
floor but that their trades were wired to an intermediary, National Financial Service Corporation
("NFSC"), who Claimants maintained delayed the orders and would wait an inordinate amount of time
before wiring orders to Pershing Division of Donaldson Lufkin & Jenrette Securities Corporation
("Pershing"). Claimants alleged that when Respondents were confronted with the problem of untimely
executions, Kelly promised to give Claimants substantial monetary adjustments. Claimants alleged that
CoreStates reneged on this promise and that Kelly's position was subsequently "eliminated".

Claimants also alleged that throughout this time period, Respondents frequently obtained funds from other
bank accounts held at CoreStates by Claimants, without Claimants prior knowledge or approval.
Claimant alleged that they told Respondents to stop raiding their other accounts, but Kelly continued to
do so. Claimants further alleged that during this time period Respondents violated federal requirements
by allowing Claimants to buy options on margin. Claimants alleged that CoreStates maintained tapes
of orders that were telephoned in and other matters, Claimants alleged that Respondents destroyed tape
recordings of conversations with Claimant Steven Schwartz concerning this dispute.

Respondents categorically denied all allegations of wrongdoing in the Claimant Ilene Schwartz's ("Mrs.
Schwartz") account. Respondents maintained, among other things, that Steven Schwartz, Mrs. Schwartz'
son, had authority to trade in his mother's account, but that he does not have standing to sue Respondents
for losses allegedly sustained in his mother's brokerage account. Respondents maintained that CoreStates
is a discount brokerage firm and that all trades were ordered by either Mrs. Schwartz or Steven Schwartz.
Respondents maintained that no trades were solicited by Kelly or any other representative of CoreStates.
Respondents maintained that Claimants exercised complete control over Mrs. Schwartz account.
Respondents maintained that they never solicited options transactions from Claimants. Respondents
maintained that every order placed by Claimants was placed by CoreStates and Kelly in a timely manner.
Respondents maintained that Claimants telephoned orders directly to CoreStates and the orders were
immediately entered into NFSC's on-line order entry system, which routed the orders either directly to
the floor of the appropriate exchange or to NFSC's block desk, depending on the size and type of the
order being entered. Respondents maintained that at times, NFSC used Pershing to execute

Schwartz Award
Case No. 92-01588
Page -4-

orders. Respondents maintained that Claimants were never promised "virtually instantaneous execution of trades." Respondents maintained that they never represented to Claimants that CoreStates "would provide direct access to the trading floor for all option trades." Respondents maintained that Claimants knew that CoreStates cleared through NFSC. Respondents maintained that it is not uncommon for an order of substantial size to be executed in multiple parts because it is not possible to execute the entire order at the same time and price. Respondents maintained that Mrs. Schwartz' account was actively traded, CoreStates designated a particular telephone line on which Claimants could call in orders so that their calls would be answered more quickly than if they had come from a general line. CoreStates maintained that at the time Claimants were trading as CoreStates, the customers had knowledge that orders that were placed by telephone were tape recorded. Respondents maintained that no tapes of conversation with the Claimant were intentionally destroyed by Respondents; they were reused periodically as were all the tapes. Respondents denied Claimants allegation that Respondents failed to sell 221 IBM November calls before expiration. Respondents maintained that Ilene Schwartz promptly sold 22,100 shares of IBM purchased as a result of the exercise of the 221 calls at a profit of more than $30,000. Respondents maintained that Claimants allegation that decreases in equity were due to trading losses or other losses caused by Respondents' handling of their orders was false. Respondents maintained that between April 1986 and November 1986, Claimants withdrew more than $2.5 million from the account and deposited, during the same period of time, less than $700,000 in the account. Respondents maintained that Claimants did not make purchases of options on margin; all option purchases were paid for in full with funds available in the account or by the deposit of additional funds into the account. Respondents maintained that in opening the brokerage account, Mrs. Schwartz instructed CoreStates in writing that when securities were sold in her account, the proceeds should be deposited in Philadelphia National Bank Account #0435-9619, and that when securities were purchased for her account, that same Philadelphia National Bank account should be charged in order to pay for the transaction. Respondents maintained that neither CoreStates nor Kelly ever offered to compensate Claimants for any trading losses that Mrs. Schwartz allegedly incurred.

Respondents asserted that Claimants' claims are barred in whole or in part by Pennsylvania's two-year statute of limitations on tort actions and four year statute of limitations on contract actions, as well as by principles of waiver, estoppel, ratification, and contributory negligence. Respondents maintained that to the extent that events occurred more than six years prior to the filing of this arbitration, those claims are barred by Rule 10304 of NASD Regulation, Inc.'s Code of Arbitration Procedure ("Code").

<u>RELIEF REQUESTED</u>

Claimants requested: damages in an amount of approximately $1,000,000; the return or disgorgement of all commissions paid to Respondents.

Respondents requested: that Claimants' claim be dismissed.

<u>OTHER ISSUES CONSIDERED & DECIDED</u>

The parties have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered. In either case, the parties have agreed to receive conformed copies of the Award while the originals remain on file with NASD Regulation.

Schwartz Award
Case No. 92-01588
Page -5-

On January 18, 1995, Respondents Pershing Division of Donaldson, Lufkin & Jenrette Securities Corporation and National Financial Services Corporation were dismissed as parties from this case.

There were two other major motions filed in this case, one by each side. Claimants filed a motion for judgment because of Respondents alleged repeated failure to comply with Claimants' discovery requests and the Panel's Orders. This motion was denied. Respondents filed a motion to dismiss Claimants' claim because the claim was not timely filed, based on the applicable statutes of limitations. This motion was also denied.

## AWARD

After considering the motions, pleadings, testimony and evidence presented at the hearing, the undersigned arbitrators have decided in full and final resolution of the issues submitted for determination as follows:

1.    The Panel finds that Claimants have carried their burden of proving their claim by the fair weight and preponderance of the evidence and are awarded compensatory damages in the amount of $402,500.00; plus interest at a rate of 3% for 10.5 years of $126,800 for a total award against Respondents CoreStates Securities Corporation and Kevin Kelly jointly and severally in the amount of $529,300.00.

2.    Claimants' claim for punitive damages is denied.

3.    . The parties shall bear their respective costs and attorneys fees except as costs and forum fees are delineated below.

4.    All other claims for relief not specifically addressed herein are denied in their entirety.

## FORUM FEES

Pursuant Rule 10332 of the Code of Arbitration Procedure, the following Forum Fees are assessed.

66 hearing sessions x $1,000 = $66,000

Forum Fees Assessed: 25% against Claimants, jointly and severally; 25% against Respondent Kevin Kelly; and 50% against Respondent CoreStates Securities Corporation.

Therefore the amount assessed against Claimants for forum fees, jointly and severally is $16,500. The amount assessed against Respondent Kevin Kelly is $16,500. The amount assessed against Respondent CoreStates Securities Corporation is $33,000.

Case No. 92-01588

Page -6-

Fees are payable to NASD Regulation, Inc.

Date Award Signed                          Concurring Arbitrators' Signatures

_11-1-97_                                   _Joseph F. Keener_
                                           Joseph F. Keener, Jr., Chairman
                                           Public Arbitrator


                                           _____
                                           John W. Lear, Panelist
                                           Public Arbitrator


Date Award Signed                          Dissenting Arbitrator's Signature


                                           _____
                                           Charles W. Lake, Panelist
                                           Industry Arbitrator

Charles W. Lake dissents from all aspects of this award, liability, damages and forum fees.


Date Award Served by NASD Regulation, Inc. _November 4, 1997_

Schwartz Award
Case No. 92-01588
Page -6-

Fees are payable to NASD Regulation, Inc.

Date Award Signed                                      Concurring Arbitrators' Signatures


_____                           _____
                                                      Joseph F. Keener, Jr., Chairman
                                                      Public Arbitrator


_11/1/97_____                         _____
                                                      John W. Lear, Panelist
                                                      Public Arbitrator


Date Award Signed                                      Dissenting Arbitrator's Signature


_____                           _____
                                                      Charles W. Lake, Panelist
                                                      Industry Arbitrator


Charles W. Lake dissents from all aspects of this award, liability, damages and forum fees.


Date Award Served by NASD Regulation, Inc._November 4, 1997_

Schwartz Award
Case No. 92-01588
Page -6-

Fees are payable to NASD Regulation, Inc.

Date Award Signed                                    Concurring Arbitrators' Signatures

_____                            _____
                                                     Joseph F. Keener, Jr., Chairman
                                                     Public Arbitrator


_____                            _____
                                                     John W. Lear, Panelist
                                                     Public Arbitrator


Date Award Signed                                    Dissenting Arbitrator's Signature


_11/1/97_____                              _____
                                                     Charles W. Lake, Panelist
                                                     Industry Arbitrator


Charles W. Lake dissents from all aspects of this award, liability, damages and forum fees.


Date Award Served by NASD Regulation, Inc. _November 4, 1997_

Exhibit **D**

CHRISTIE, PABARUE, MORTENSEN and YOUNG,   Additional Attorneys for Defendants
A Professional Corporation                Brian W. Shaughnessy, Esquire and
James W. Christie/Catherine Olanich Raymond   Shaughnessy, Volzer & Gagner, P.C.
Identification Nos. 12068/43116
1880 JFK Boulevard - 10th Floor
Philadelphia, PA  19103
(215) 587-1600

| | |
|---|---|
| GEORGE HANDEL, EXECUTOR OF ESTATE OF SAMUEL HANDEL, DEC'D, *et al.*,<br>Plaintiffs,<br><br>v.<br><br>STEVEN SCHWARTZ, *et al.*,<br><br>Defendants,<br><br>v.<br><br>BRIAN W. SHAUGHNESSY, ESQUIRE and SHAUGHNESSY, VOLZER & GAGNER, P.C.,<br><br>Additional Defendant | IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY<br><br>FEBRUARY TERM, 2000<br><br>NO. 525 |

## AFFIDAVIT OF BRIAN W. SHAUGHNESSY

I, Brian W. Shaughnessy, being of full age, do hereby certify as follows:

1.      I am a shareholder in the law firm of Shaughnessy, Volzer & Gagner, P.C. ("the firm") and an individual defendant in the action filed in the Court of Common Pleas of Philadelphia County as February Term 2000, Number 525.  I have personal knowledge of the facts of the matters set forth herein.

2.      A copy of the third-party complaint against me was received in our offices, together with our regular mail delivery on May 4, 2000.  The envelope was labeled "First Class Mail" but had a return receipt.  No one presented the receipt to me for signature.  I did not sign the receipt, and no one else signed the receipt on behalf of me or the firm.

309961-1

The complaint appears to have been given without a request for signature to a receptionist, who does not have authority to sign return receipts for me or for the firm. A copy of the still unsigned receipt is attached hereto as Exhibit "A". On May 8, 2000, a copy of the third party complaint against the firm was received in the same manner as described above. Neither I nor the firm consented to service of process in this action in any manner.

3.      At certain times relevant to this action, I represented Defendant Steven Schwartz as legal counsel.

4.      I live in Washington, D.C., and the firm has its only office at 1155 Fifteenth Street, N.W., Suite 502, Washington, D.C. In addition, I maintain an office in Mount Holly, New Jersey.

5.      I am a member of the bars of the District of Columbia, the State of Maryland, and the State of New Jersey. I am not licensed to practice law in Pennsylvania. With the exception of a small number of matters I have handled for Steven Schwartz, my legal practice has not required communicating with persons in Pennsylvania.

6.      Shaughnessy, Volzer & Gagner, P.C. was formed under the laws of the District of Columbia. To the best of my knowledge, none of the other lawyers who practice with the firm practice law in Pennsylvania or represent clients whose cases require communications or other contacts with Pennsylvania.

7.      At certain times relevant to this action, I made certain communications to the Delaware offices of Defendant Legg Mason Wood Walker, Inc., concerning certain investment accounts which I understand relate to plaintiffs to this action. I made those

communications solely at the direction of Steven Schwartz, who was then my client and a client of Shaughnessy, Volzer & Gagner, P.C. I made those communications to Legg Mason solely because I was advised by Legg Mason that Legg Mason would not accept direct communications of any kind from my client, but would accept an indirect communication through my office.

8. At the time I made the communications to Legg Mason on behalf of Mr. Schwartz, it was my understanding that Mr. Schwartz had authority to handle the plaintiffs' accounts. I was not aware at that time that there was any question about Mr. Schwartz's use of that authority.

I certify that the above statements are true. I am aware that if any of the above statements are willfully false, I will be subject to punishment.

Date: _June 12 2000_                    _Brian W Shaughnessy_
                                         BRIAN W. SHAUGHNESSY

Exhibit E

Please wire transfer #32,500.00
out of my account:
      Peggy Dorsey          FX1
      29251075

To:

    PNC Bank                     5/25 - 4:07 busy ③
    ABA # 031000053              817-571-2048
    For Further Credit to        5/26 - 7:50am
    Samuel Handle → 13 Melissa Way
    Act # 8000257881      Plymouth mtg, PA
                                  19462

    Thank you
         Peggy Dorsey

    Peggy Dorsey        (817) 571-2048

                              **102263**

D-302a (Rev. 10-6-95)

196D-PH-86844

Continuation of FD-302 of    **PEGGY SUE DORSEY**    , On  08/21/2002  , Page   6

DORSEY advised that she has never heard of SAM HANDEL or JENNIE ARTZT.